**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| KRISTOFFER HICKS and MASHEEHA HOPPER on behalf of themselves and all others similarly situated,<br><br>                Plaintiff,<br>      v.<br><br>NAVY FEDERAL CREDIT UNION and DOES 1-20,<br><br>                Defendants. | Case No:  1:23-cv-1798<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## I.      INTRODUCTION

1.      Navy Federal Credit Union ("Navy Federal") systematically discriminates against African Americans, Latinos, Native Americans and other racial minorities by denying mortgage applications that would have been approved for similarly situated white Americans.

2.      As Navy Federal's *own data* shows, in 2022, it denied African American home loan applications at a rate of 52%, while it only denied 23% of white applicants.

3.      Navy Federal denied Latino home loan applications at a rate of 44%, while it only denied 23% of white applicants.

4.      Navy Federal denied Native American home loan applications at a rate of 36%, while it only denied 23% of white applicants.

5.      In fact, a December 2023 thirty-party analysis of Navy Federal's data found that:

> Navy Federal had statistically significant racial disparities in its mortgage approval rates while holding constant more than a dozen different variables including the applicant's income and debt-to-income ratio, the loan amount, the property value, and the neighborhood's socioeconomic makeup.
>
> Even among applicants who were identical among all those variables, the analysis found, Black applicants were more than twice

as likely to be denied as White applicants, and Latino applicants were roughly 85% more likely to be denied than White applicants.[1]

6.    Said differently, Navy Federal's own data reflects one clear and unmistakable conclusion:  Navy Federal—the nation's largest credit union, with over $165 billion in assets and 13 million members—systemically and intentionally discriminates against minority borrowers across the United States.

7.    With home ownership serving as the traditional foundation of a stable, middle-class life, Navy Federal's practices deny minority borrowers access to the American dream.

8.    Compounding these problems, Navy Federal's customer base primarily consists of active-duty military, military families, and veterans, meaning that when Navy Federal discriminates, it's the current and former members of the armed forces—and their families—who are harmed.

9.    Plaintiff Kristoffer Hicks's experience with Navy Federal is instructive. Mr. Hicks, who is African American, is active-duty military in the United States Army, and a father of five.

10.    He has an annual income of approximately $90,000, has minimal debt, and a credit score that qualifies him for a VA Loan.

11.    Despite this, when Plaintiff Hicks applied for a VA Loan through Navy Federal to purchase a home for himself and his family, his application was denied, when the loan would have been approved by Navy Federal for a similarly situated white applicant.

12.    The experience of Masheeha Hopper and members of the putative Class are substantially similar:  Navy Federal denied them home loans that they were qualified for because of their race.

---

[1] https://www.cnn.com/2023/12/14/business/navy-federal-credit-union-black-applicants-invs/index.html, attached hereto as **Exhibit A.**

13.     What Navy Federal has done is not just wrong. It is illegal.

14.     As further set forth below, Plaintiffs Hicks and Hopper bring this putative class action against Navy Federal to hold it accountable for its unlawful discrimination, to stop the practices, and to ensure that the injured class members receive the actual, punitive, exemplary and statutory damages that they are entitled to under state and federal law, among other remedies.

## II.     JURISDICTION

15.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1343(a)(4) because Plaintiffs assert federal civil rights causes of action.

16.     This Court also has diversity jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because there exists minimal diversity between class members and Defendants and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

## III.    VENUE

17.     This Court is the proper venue for this matter pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Navy Federal has substantial and systematic contacts in the District as alleged within this Complaint, including because its principal place of business and headquarters are located within the District.

18.     The case has been properly assigned to the Alexandria Division of this District under Local Rule 3(B)(1) because a substantial part of the events or omissions that gave rise to Plaintiffs' claims occurred in Fairfax County, as alleged within this Complaint, including because Navy Federal's principal place of business and headquarters are located within the Division.

## IV.  PARTIES

### A.  Plaintiffs.

#### 1.  Kristoffer Hicks.

19.  Plaintiff Kristoffer Hicks, who is African American, is a natural person and a citizen of the State of South Carolina and resides in Elgin, South Carolina.

20.  Plaintiff Hicks is a victim of Navy Federal's discriminatory lending practices, as further detailed in Paragraphs 58 to 71, below.

#### 2.  Masheeha Hopper.

21.  Plaintiff Masheeha Hopper, who is African American, is a natural person and a citizen of the State of Arizona and resides in Buckeye, Arizona.

22.  Plaintiff Hopper is a victim of Navy Federal's discriminatory lending practices, as further detailed in Paragraphs 72 to 89, below.

### B.  Defendants.

23.  Defendant Navy Federal Credit Union is a credit union headquartered in Vienna, Virginia, chartered and regulated under the authority of the National Credit Union Administration. It is the largest credit union in the country, with over $165 billion in assets, over 13 million members, and over 14,000 employees.

24.  Navy Federal primarily serves members of the military, military families, and veterans. According to Navy Federal's website, "[t]o become a member, you or one of your family or household members must have ties to the armed forces, DoD or National Guard."[2]

---

[2] https://www.navyfederal.org/membership/become-a-member.html

25.     Navy Federal provides banking services for its members throughout the United States, including first and second lien residential mortgages, residential mortgage refinancings, and home equity lines of credit.[3]

26.     In 2022, Navy Federal issued approximately 50,000 mortgage loans for a total of about $16.5 billion, and ended 2022 with a mortgage lending portfolio of over $84 billion.[4]

27.     On information and belief, Does 1-20 are individuals and/or entities who engage in the unlawful conduct detailed in this complaint with Navy Federal. The identities of Does 1-20, however, are not presently known to Plaintiffs.  Plaintiffs expressly reserve their right to amend this Complaint to name the Doe defendants, once their identities are known.

## V.      FACTUAL BACKGROUND

### A.      Home Ownership Is the Foundation of the American Dream.

28.     The benefits of homeownership have long been the cornerstone of the American Dream and one of the surest paths to financial security and a middle-class life.

29.     As a report from Habitat for Humanity recently explained:

> Homeownership promotes wealth building by acting as a forced savings mechanism and through home value appreciation.

> Homeowners make monthly payments that increase their equity in their homes by paying down the principal balance of their mortgage. Home value appreciation also helps homeowners build wealth by enabling them to realize greater proceeds if they sell the home or borrow against the additional equity.

> In addition, owning a home promotes intergenerational homeownership and wealth building. Children of homeowners transition to homeownership earlier — lengthening the period over

---

[3] https://www.navyfederal.org/loans-cards/mortgage.html, https://www.navyfederal.org/loans-cards/equity.html

[4] https://www.navyfederal.org/content/dam/nfculibs/pdfs/membership/2022-annual-report.pdf

which they can accumulate wealth — and have homeownership rates 25 percentage points higher than the rate of children of renters.[5]

30.     Consistent with these important benefits, the United State government has consistently promoted and subsidized access to home ownership.

31.     For example, in the 1800s and 1900s, the Homestead Act (and other similar acts designed to promote the United States' westward expansion) provided an opportunity for families to acquire between 160 and 640 acres of land for free, provided the family lived on and developed the land.

32.     In the 1930s, with the country suffering from the Great Depression, the Federal Housing Administration was created to subsidize and promote the development of additional housing across the nation.

33.     After World War II, the Servicemen's Readjustment Act of 1944—commonly called the G.I.-Bill—provided millions of returning veterans access to cheap, subsidized mortgages to purchase homes.

**B.     While White America Benefited from These Policies, Racial Minorities Had the Door to the American Dream Slammed Shut.**

34.     These housing policies led to the creation of the modern American middle class. But critically, those benefits left many behind: African Americans, Latinos, Native Americans and other racial minorities were generally excluded from these programs.

35.     For example, the Homestead Act (and other similar acts designed to promote the United States' westward expansion) was only available to free men, generally involved the "settling" of Native American land, and in practice, even after slavery ended, only a small portion of all homesteads were issued to racial minorities.

---

[5] https://www.habitat.org/sites/default/files/Evidence-Brief_Wealth-building-for-homeowners.pdf

36.     While the Federal Housing Administration was subsidizing the development of new neighborhoods in the 1930s, 40s, and 50s, it did so with the express requirement that "none of the homes be sold to African-Americans."[6]  Further, "the Federal Housing Administration refus[ed] to insure mortgages in and near African-American neighborhoods — a policy known as 'redlining.'"[7]

37.     Similarly, after the end of World War II, while white veterans benefited greatly from the G.I. Bill, "the U.S. was still segregated when the GI Bill became law [and] that meant many Black veterans were left behind."[8]

38.     The passage of the Fair Housing Act of 1968 marked a shift in policy away from this legally sanctioned discrimination, by making it "unlawful for any person or other entity . . . engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin."  42 U.S.C. § 3605(a).

39.     But despite the passage of these critical civil rights laws, millions of Americans continue to face discrimination in mortgage lending to this day.

---

[6]     https://www.npr.org/2017/05/03/526655831/a-forgotten-history-of-how-the-u-s-government-segregated-america

[7] *Id.*

[8] https://www.npr.org/2022/10/18/1129735948/black-vets-were-excluded-from-gi-bill-benefits-a-bill-in-congress-aims-to-fix-th#:~:text=Music%20Of%202023-,Black%20vets%20were%20excluded%20from%20GI%20bill%20benefits%20%E2%80%94%20a%20bill,and%20came%20home%20to%20segregation.

**C.      Modern Problems Require Modern Solutions: Using Big Data to Identify Mortgage Lending Discrimination in the 21st Century.**

40.     In an effort to further combat those discriminatory practices, the Home Mortgage Disclosure Act, as amended by the 2010 Dodd–Frank Wall Street Reform and Consumer Protection Act, requires lenders to provide certain data to the Consumer Financial Protection Bureau ("CFPB"). This data is frequently called "HMDA Data."

41.     Certain fields in the HMDA Data are made publicly available through the CFPB's website: https://www.consumerfinance.gov/data-research/hmda/

42.     Navy Federal is one of the thousands of financial institutions that is required to submit its mortgage lending data to the CFPB. Consistent with this requirement, Navy Federal submitted its 2022 data, which was in turn published online by the CFPB.

43.     A third-party analysis of HMDA Data reflects that many major lenders are engaged in discriminatory lending practices, but Navy Federal's practices stand out as by far the worst. *See* Ex. A.

44.     For example, here is a chart reflecting the racial gap between African American and white applicants at several major lenders, including Navy Federal:



45.     As the data makes clear, Navy Federal's discriminatory practices put them in a league of their own.

**D.    Navy Federal's Own Data Shows that It Systemically Discriminates Against Racial Minorities in Mortgage Lending.**

46.    The HMDA Data clearly and unequivocally shows that Navy Federal rejects a disproportionate number of non-white applicants. Ex. A.

47.    According to Navy Federal's *own 2022 data*:

    a.    Navy Federal denied African American home loan applications at a rate of 52%, while it only denied 23% of white applicants. *Id.*

    b.    Navy Federal denied Latino home loan applications at a rate of 44%, while it only denied 23% of white applicants. *Id.*

    c.    Navy Federal denied Native American home loan applications at a rate of 36%, while it only denied 23% of white applicants. *Id.*

48.    In fact, an African American earning $140,000 or more per year had approximately the same odds of being approved for a home loan by Navy Federal as a white applicant who only earned $61,000 or less, according to the 2022 data:



**Black applicants had lower approval rates than those of other racial groups, at every income level**

Navy Federal Credit Union's loan approval rates for Black, Latino, Asian and White applicants by income in 2022

49.    A December 2023 thirty-party analysis of Navy Federal's data found that:

Navy Federal had statistically significant racial disparities in its mortgage approval rates while holding constant more than a dozen different variables[9] including the applicant's income and debt-to-income ratio, the loan amount, the property value, and the neighborhood's socioeconomic makeup.

Even among applicants who were identical among all those variables, the analysis found, Black applicants were more than twice as likely to be denied as White applicants, and Latino applicants were roughly 85% more likely to be denied than White applicants.[10]

50.    And the gap in approval rates has nearly tripled over the past five years:



The gap between Black and White mortgage applicants has widened

Navy Federal Credit Union's loan approval rates for White and Black applicants from 2018 to 2022

51.    Said differently, Navy Federal's own data reflects one clear and unmistakable conclusion:  Navy Federal—the nation' largest credit union, with over $165 billion in assets and

---

[9] These variables included: "the applicant's income, the applicant's debt-to-income ratio, the loan amount, the loan term, the loan-to-value ratio, the property value, the presence of a co-applicant, the applicant and co-applicant's sex, the credit scoring model used to generate the applicant's credit score, the primary applicant's age, the minority population percentage of the property's census tract, the median age of housing units in the property's census tract, and the difference between the median income of the metro area and the median income of the property's census tract." **Ex. A.**

[10] **Ex. A.**

13 million members—systemically and intentionally discriminates against minority borrowers across the United States.[11]

52.     Navy Federal is no doubt well aware that properly functioning banks, including some of its competitors, correct for biases within underwriting processes by employing trained underwriters and fair lending teams to prevent systematic discrimination.

53.     But as Navy Federal's own data confirms—Navy Federal failed to take appropriate steps to ensure a fair and unbiased application, review and approval process.

**E.     Navy Federal's Discrimination Harmed Applicants.**

54.     Navy Federal's practices directly harmed non-white applicants by preventing them from obtaining favorable loan terms in order to buy or refinance a home at prevailing market rates, causing them to either accept higher rates throughout their mortgage and/or causing them to fail to obtain a mortgage altogether.

55.     These practices were particularly impactful for applicants in the past several years.

56.     Before the Federal Reserve's recent series of interest rate increases beginning in 2022, mortgage interest rates were historically low in the United States. Purchasing (or refinancing) a home during this time period allowed homeowners to pay very low monthly payments, particularly compared to current interest rates.

57.     These differences in interest rates can add up to hundreds of thousands of dollars—and in some cases over a million dollars—over the course of a home loan.

---

[11] At a bare minimum, it is beyond dispute that the data shows a significant disparate impact in the mortgage application approval rates between white and non-white applicants. On information and belief, Navy Federal will not be able to demonstrate a lawful basis for this disparate impact.

**F.      The Impact of Navy Federal's Discriminatory Lending Practices on Plaintiffs.**

       **1.      Plaintiff Kristoffer Hicks**

58.      Plaintiff Kristoffer Hicks, who is African American, has been a member of Navy Federal since approximately 2010.

59.      Plaintiff Hicks was eligible for a Navy Federal membership because he is active-duty military in the United States Army.

60.      He is married and has five children.

61.      Plaintiff Hicks applied for a loan insured by the Veterans Administration ("VA Loan") with Navy Federal in March 2023 to purchase a home in Elgin, South Carolina.

62.      At the time of application, Plaintiff Hicks was working as a logistician/army recruiter, and had an annual income of approximately $90,000.

63.      Plaintiff Hicks credit score was above 620 as required for a VA Loan, and he had minimal outstanding debt obligations consisting of only a credit card and motorcycle loan.

64.      Plaintiff Hicks was qualified for the loan he sought from Navy Federal.

65.      Despite this, when Plaintiff Hicks submitted a mortgage application to Navy Federal the application was denied.

66.      Because of the denial, Plaintiff Hicks was unable to buy the house for which he sought the loan.

67.      Plaintiff Hicks was forced to turn to other lenders.

68.      Plaintiff Hicks received approval from Silverton Mortgage, and received a VA loan in June of 2023 for the purchase of a different, smaller home.

69.      However, the Silverton loan was for a higher interest rate and lower value than the loan Plaintiff Hicks was qualified for at Navy Federal.

70.     Due to the higher interest rate, Plaintiff Hicks's monthly payments are more than they would have been with Navy Federal.

71.     Plaintiff Hicks pays more to live in a smaller house because of Navy Federal's racial discrimination.

### 2.     Plaintiff Masheeha Hopper

72.     Plaintiff Masheeha Hopper, who is African American, has been a member of Navy Federal since approximately 2015.

73.     Plaintiff Hopper was eligible for a Navy Federal membership because her sister served in the United States Army.

74.     Plaintiff Hopper is a medical assistant and the caretaker of her daughter, who is disabled.

75.     Plaintiff Hopper applied for a mortgage, sought to refinance her mortgage, and applied for a home equity line of credit (HELOC) with Navy Federal between 2021 and 2023.

76.     At the time of each application, Plaintiff Hopper, was working as a medical assistant, and had an annual income of approximately $86,000.

77.     Plaintiffs' credit score was approximately 700.

78.     Plaintiff Hopper was qualified for each of the loans she sought from Navy Federal.

79.     Despite this, Navy Federal denied each and every loan application submitted by Plaintiff Hopper.

80.     Specifically, in or about March and April 2021, Plaintiff Hopper applied for a mortgage loan with Navy Federal to purchase a home in Arizona.

81.     Navy Federal denied Plaintiff Hopper's mortgage application.

82.     Plaintiff Hopper's mortgage application was granted by another lender, NFM Lending. The NFM mortgage required Plaintiff Hopper to pay $12,000 toward the downpayment, whereas the Navy Federal mortgage that Plaintiff Hopper was qualified for would have required no downpayment.

83.     With the loan she received from NFM, Plaintiff Hopper purchased a $301,000 home. Due to the fact that Navy Federal denied her loan application, Plaintiff Hopper paid $12,000 out of pocket that she otherwise would not have paid and was thus had drastically fewer options to buy the home she desired for herself and her daughter.

84.     In or about October and November 2022, Plaintiff Hopper sought to refinance her mortgage through Navy Federal but was again denied by Navy Federal, despite being qualified for the refinance.

85.     Plaintiff Hopper's request to refinance was granted by NFM Lending, who had provided the underlying mortgage. The refinance provided by NFM Lending was costlier for Plaintiff Hopper than the Navy Federal refinancing terms would have been.

86.     In or about April and May 2023, Plaintiff Hopper applied for a HELOC with Navy Federal, but was denied by Navy Federal for a third time despite being qualified.

87.     Plaintiff Hopper's HELOC application was granted by another lender.

88.     The HELOC Plaintiff Hopper ultimately obtained has a variable interest rate, whereas the Navy Federal HELOC that Plaintiff Hopper was denied would have had a fixed interest rate.

89.     Due to the fact that Navy Federal denied her HELOC application, Plaintiff Hopper has been saddled with payments that have ballooned with rising rates and has experienced acute stress and financial hardship as a result.

## VI.    CLASS ALLEGATIONS

90.    Plaintiffs bring this action on behalf of themselves and all other similarly situated racial minority mortgage applicants[12] who had a mortgage application denied or approved on less favorable terms as compared to similarly situated white applicants by Navy Federal.

91.    Class certification is authorized under Federal Rule of Civil Procedure 23, including under subjections 23(b)(2), 23(b)(3), and 23(c)(4).

92.    Plaintiffs reserve the right to amend the definitions of the Class (provided below) and/or to seek the certification of additional and/or different Classes and/or Subclasses.

93.    Each and every claim alleged in this Complaint is also alleged on behalf of every member of the Class, which consists of:

> All Applicants in the United States who, from 2018 through the present (the "Class Period"), submitted an application for a home mortgage loan (including home refinancing) to Navy Federal that was either denied or approved on less favorable terms as compared to similarly situated white applicants.

94.    The Class is represented by Plaintiffs.

95.    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action, members of their staffs (including judicial clerks), and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and their current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendants' counsel, and non-attorney

---

[12] Specifically, all mortgage loan applicants falling within any one of the ethnic or racial aggregate categories and subcategories set forth in 12 C.F.R. §§ 1003, *et. seq.,* other than "White" and "Not Hispanic or Latino" ( "Applicants").

employees of their firms; and (6) the legal representatives, successors, and assigns of any such excluded persons.

**G.      The Rule 23 Elements.**

96.      **Ascertainability.** Plaintiffs are informed and believe that the identities of members of the Class are ascertainable through Defendants' records, because, among other reasons, Navy Federal is required to keep records for each mortgage loan application it receives.

97.      **Numerosity.** Plaintiffs are informed and believe that there are tens of thousands of members of the Class. For example, a third-party analysis of Navy Federal's data found that there were approximately 3,700 African American home loan applications rejected in 2022 alone. Ex. A.

98.      **Commonality.** Defendants have acted or refused to act on grounds that apply generally to the Class. Absent certification of the Class, the relief sought herein creates the possibility of inconsistent judgments and/or obligations imposed on Defendants. Numerous common issues of fact and law exist, including, without limitation:

a.   Whether the Class's residential loan applications were denied when a similarly situated white applicants would have been or were approved;

b.   Whether Defendants systematically discriminated against Class Members on account of their race or ethnicity;

c.   Whether Defendants' lending policies and practices had an unlawful disparate impact against the Class;

d.   Whether Defendants' underwriting programs were racially biased and led to unfairly discriminatory credit policies that harmed the Class;

e.   Whether the disparate impact of Defendants' underwriting programs on the Class was known to Defendants during the relevant time period;

f.   Whether residential loans to members of the Class were made at higher interest rates as compared to similarly situated white applicants;

g.   Defendants' internal loan approval processes; and

h.   Whether Defendants engaged in discriminatory practices with malice or reckless indifference to the legally protected rights of the Class.

99.   **Predominance.** These common issues predominate over individualized inquiries in this action because Defendants' liability can be established as to all members of the Class as discussed herein. Plaintiffs are not aware of any potential difficulty in the management of this litigation that should preclude its maintenance as a class action.

100.   **Typicality.** Plaintiffs' claims are typical, if not identical, to the claims that could be asserted by all members of the Class. Plaintiffs' claims arise from Defendants' practices applicable to all such class members.

101.   **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs' claims are representative of the claims of the other members of the Class, as Plaintiffs and each member of the Class had their home loan mortgage applications denied by Navy Federal (or approved on materially worse terms than of a similarly situated white applicant). Plaintiffs also have no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to the Class.

102.   **Superiority.** There are substantial benefits to proceeding as a class action that render proceeding a class action superior to any alternatives, including that it will provide a realistic means for members of the Class to recover damages; it would be substantially less burdensome on the courts and the parties than numerous individual proceedings; many members of the Class may be unaware that they have legal recourse for the conduct alleged herein; and because issues common to members of the Class can be effectively managed in a single proceeding. Plaintiffs know of no difficulty that could be encountered in the management of this litigation that would preclude its maintenance as a class action.

103.   Plaintiffs reserve the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

## VII.   CAUSES OF ACTION

### A.   First Cause of Action: Race Discrimination in Violation of the Fair Housing Act of 1968, 42 U.S.C. §§ 3601, *et seq.* (On Behalf of Plaintiffs and the Class)

104.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 103, inclusive, of this Complaint.

105.   The Fair Housing Act makes it "unlawful for any person or other entity . . . engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin."  42 U.S.C. § 3605(a).

106.   Plaintiffs and others similarly situated are "aggrieved persons" under the meaning of that term in 42 U.S.C. § 3613.

107.   Plaintiffs and others similarly situated sought to engage in residential real estate transactions with Defendants.

108.    Plaintiffs and others similarly situated are members of a protected class under the Fair Housing Act.

109.    Plaintiffs and those similarly situated were qualified for the residential mortgages (including refinancing and/or HELOCs) they sought from Navy Federal.

110.    Defendants refused to transact business with Plaintiffs and those similarly situated because of their race and at the same time did transact business with similarly qualified white applicants.

111.    Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them as set forth in this Complaint, including, without limitation, because they paid application fees for residential loan applications that were improperly denied, because they were charged higher interest rates than similarly qualified white applicants, and/or because their applications were denied as a result of racial discrimination.

**B.    Second Cause of Action:  Race Discrimination in Violation of 42 U.S.C. § 1981 (On Behalf of Plaintiffs and the Class)**

112.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 103, inclusive, of this Complaint.

113.    Under 42 U.S.C. § 1981(a), "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts.  . . as is enjoyed by white citizens."

114.    Section 1981(a) confers a private right of action on the victims of discrimination by private entities in, inter alia, the making and enforcement of contracts.

115.    The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, as well as all other aspects of a contractual relationship, including in residential mortgage lending.

116.     By seeking residential mortgages with Defendants (including by attempting to refinance their home loans), Plaintiffs and others similarly situated sought to "make and enforce" contracts with Defendants.

117.     Plaintiffs and those similarly situated were qualified for the residential mortgages (including refinancing and/or HELOCs) they sought to contract with Defendants for.

118.     Despite being qualified, Defendants denied Plaintiffs and those similarly situated their right to make and enforce contracts because of their race by rejecting their mortgage applications and/or offering them terms less favorable than those offered to similarly situated white applicants.

119.     Plaintiffs and those similarly situated were harmed by Defendants' denial of their rights to make and enforce contracts with them as set forth in this Complaint, including, without limitation, because they paid application fees for residential loan applications that were improperly denied, because they were charged higher interest rates than similarly qualified white applicants, and/or because their applications were denied as a result of racial discrimination.

**C.     Third Cause of Action: Violation of the Equal Credit Opportunity Act 15 U.S.C. §§ 1691, *et seq.* (On Behalf of Plaintiffs and the Class)**

120.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 103, inclusive, of this Complaint.

121.     The Equal Credit Opportunity Act, 15 U.S.C. §§ 1691(a)(1), makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, [or] national origin."

122.     The Equal Credit Opportunity Act applies to applications for residential loans for original purchase mortgages and mortgage refinancing, like those of the Plaintiffs and others similarly situated.

123.     Plaintiffs and those similarly situated are "aggrieved applicants" under the meaning of that term in 15 U.S.C. § 1691e(a).

124.     Plaintiffs and those similarly situated applied for credit by seeking to finance their home purchases or refinance their existing home loans.

125.     Plaintiffs and those similarly situated were qualified for the residential mortgages (including refinancing and/or HELOCs) they sought from Defendants.

126.     Defendants are creditors with the meaning of the Equal Credit Opportunity Act because they regularly extend, renew, and continue issuances of credit.

127.     Defendants denied the mortgage applications submitted by Plaintiffs and members of the Class because of their race while approving mortgages (including refinancing and/or HELOCs) for similarly situated white applicants.

128.     Plaintiffs and all those similarly situated were harmed by Defendants' conduct including, without limitation, because they paid application fees for residential loan applications that were improperly denied, because they were charged higher interest rates than similarly qualified white applicants, and/or because their applications were denied as a result of racial discrimination.

**D.     Fourth Cause of Action: Declaratory Judgment, 28 U.S.C. § 2201 (On Behalf of Plaintiffs and the Class)**

129.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 103, inclusive, of this Complaint.

130.     The Declaratory Judgement Act, 28 U.S.C. § 2201, provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

131.    As alleged above, Plaintiffs and the Class seek a declaration that Defendants' practices unlawfully discriminate in mortgage lending (including refinancing and/or HELOCs).

132.    An actual, present and justiciable controversy has arisen between Plaintiffs and the Class on the one hand and Defendants on the other hand concerning Defendants' practices.

133.    Plaintiffs and the Class seek declaratory judgment from this Court that Defendants' mortgage lending practices (including refinancing and/or HELOCs) violate 42 U.S.C. §§ 3601, *et seq.*, 42 U.S.C. § 1981, and 15 U.S.C. §§ 1691, *et seq.*

## VIII.   PRAYER FOR RELIEF

134.    WHEREFORE, Plaintiffs respectfully request that this Court:

   a.   Find that Defendants have engaged in a pattern and practice of racial discrimination resulting in the harm to Plaintiffs and the Class as described above;

   b.   Declaring Defendants' practices of to be unlawful;

   c.   Enjoining Defendants' unlawful practices;

   d.   Awarding Plaintiffs and the Class actual damages;

   e.   Awarding Plaintiffs and the Class compensatory damages;

   f.   Awarding Plaintiffs and the Class statutory damages, where permitted by applicable law;

   g.   Awarding Plaintiffs and the Class treble damages, where permitted by applicable law;

   h.   Awarding Plaintiffs and the Class exemplary and/or punitive damages, where permitted by applicable law;

i.  Awarding Plaintiffs and the Class restitution of the amounts unlawfully taken from them by Defendants;

j.  Disgorging Defendants of the amounts unlawfully taken from Plaintiffs and the Class;

k.  Awarding Plaintiffs and the Class attorneys' fees and costs;

l.  Awarding Plaintiffs and the Class pre- and post-judgment interest, as applicable; and

m. All further relief as the Court deems just and proper.

Date: December 28, 2023

*/s/ Peter Silva*

Peter Silva (State Bar No. 80935)
*psilva@tzlegal.com*
Glenn Chappell (State Bar No. 92153)
*gchappell@tzlegal.com*
Hassan Zavareei *(pro hac vice to be filed)*
*hzavareei@tzlegal.com*
Andrea Gold *(pro hac vice to be filed)*
*agold@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Wesley M. Griffith *(pro hac vice to be filed)*
*wgriffith@tzlegal.com*
Cort Carlson (*pro hac vice to be filed*)
*carlson@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

*Counsel for Plaintiffs and the Putative Class*

## IX.     DEMAND FOR TRIAL BY JURY

Plaintiffs, on behalf of themselves and the putative Class, hereby respectfully demand a

trial by jury on all claims.

Date: December 28, 2023                      /s/ Peter Silva
_____

Peter Silva (State Bar No. 80935)
*psilva@tzlegal.com*
Hassan Zavareei *(pro hac vice to be filed)*
*hzavareei@tzlegal.com*
Andrea Gold *(pro hac vice to be filed)*
*agold@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue, NW, Suite 1010
Washington, District of Columbia 20006
Telephone: (202) 973-0900
Facsimile: (202) 973-0950

Wesley M. Griffith *(pro hac vice to be filed)*
*wgriffith@tzlegal.com*
Cort Carlson (*pro hac vice to be filed*)
*carlson@tzlega..com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808
Facsimile: (202) 973-0950

*Counsel for Plaintiffs and the Putative Class*